## Norris's Appeal.   Terry's Appeal.

When the plan of a building is changed and greatly enlarged, while in the course of erection, the liens of mechanics and material-men, subsequent to such change, relate only to the commencement of the alteration on the ground, and are subject to all liens which have then fastened on the land.

In the distribution of the proceeds of a sheriff's sale, a judgment in a *scire facias* on a mechanic's claim, is not even *primâ facie* evidence, that it was filed within six months after the completion of the work, so as to give it relation back to the commencement of the building, in a contest with other lien claimants.

Armstrong *v.* Ware, 8 *Harris* 519, considered.

APPEALS from the District Court of *Philadelphia*.

These were appeals by Charles Norris and Harvey Terry, from the decree of the District Court, distributing the proceeds of a sheriff's sale of the real estate of William Conaway.

The auditor appointed to report distribution of the fund, reported that the ground sold by the sheriff was conveyed to William Conaway, the defendant, in two parcels, one of them on the 1st January 1852, and the other on the 17th February 1853. On the 3d March 1853, he commenced the erection, on a part of the premises, of a building, designed as a manufactory for making saws by hand.

After he had commenced, and before the completion of this building, he determined to enlarge his plan, so as to carry on the business with steam power.  This change rendered necessary a number of additional buildings adjoining that first contemplated, and a large outlay of money.  Accordingly an engine-house, with a costly steam engine, and other buildings, were commenced and erected.  Before the original building was finished, though after he had entertained the design of enlargement, Conaway moved into the premises.  The mechanics' claims up ·to this time were all discharged, and Conaway, on the 15th August 1853, mortgaged the entire premises to Charles Norris, for $2175.50.  No part of the intended improvements was then begun upon the ground.

Subsequently to the commencement of the additional buildings, Conaway executed two other mortgages of the premises to Charles Norris, one of them on the 1st October 1853, for $1625, and the other of them on the 17th May 1854, for $2168.12; and Harvey Terry and others obtained various judgments against him.

The mechanics engaged in constructing the enlargement filed their claims against the entire lot and buildings.  The auditor reported that the whole, when complete, constituted one manufacturing establishment, so that they would all pass by a deed, under the description of a "saw factory."

[Norris's Appeal—Terry's Appeal.]

Three sets of claimants appeared before the auditor: 1. Charles Norris claiming under his mortgages. 2. Harvey Terry, claiming under the first judgment after the mortgages. 3. The mechanics, who had done work on the additional buildings.

One of the claims was filed by Hooven & Rankom, on the 18th September 1854, for brick work done and performed between the 1st February 1854, and the 18th March 1854. On the 28th September 1854, they obtained judgment on their *sci. fa.*; but the auditor reported that it was impossible to ascertain, from the parol evidence, the exact time when their work was ended.

The auditor awarded the fund first to the payment of the mortgages in full, and then to the judgments in the order of their priority. He also reported an alternative table of distribution, in which the fund was appropriated, first in payment of the mechanics' claims in full (except that of Hooven & Rankom), and the balance to the mortgages. To this various exceptions were filed, and the court below reversed the decision of the auditor, and decreed the fund, first to the payment of the mortgage of Charles Norris, of the 13th August 1853, then to the payment in full of the mechanics' liens (except that of Hooven & Rankom), and the balance on account of the second mortgage.

The following opinion was delivered by SHARSWOOD, P. J.—

" The question which is presented upon these exceptions is new, and the principle to be settled by its final decision of great importance. It must be confessed, also, that it is a question of no little difficulty. The Acts of Assembly in relation to mechanics' liens, establish a system altogether out of the course of the common law; and upon points, evidently not foreseen by the legislature, and upon which the statutes have not spoken, the only grounds of decision to which we can resort, must be the general scope and spirit of the enactments, the analogy of cases which have already been settled, and such considerations of policy as may be supposed to have had their influence on the minds of the law makers. We are undoubtedly to aim at such results as will most effectually promote the interest and security of those classes of men whom the system was designed to favour.

· " The facts are, that Conaway was the owner of a large lot of ground. On a part of this lot he commenced the erection of a building, intended as a manufactory for making saws by hand. After he had commenced, and before he had completed this building, he determined to enlarge his plan so as to carry on his business with steam power. This change made necessary a number of additional buildings adjoining that first contemplated, and a very considerable outlay of money. Accordingly an engine house, with a costly steam engine, and other buildings, were then commenced and erected. Before the original building was finished,

though it would seem, after he had entertained the design of enlargement, Conaway, who had been carrying on the business of manufacturing saws by hand at another place, moved into the premises. The mechanics' claims up to this time were all discharged, and Conaway raised on mortgage of the entire lot the sum of $2175. No part of the intended improvements was then begun on the ground. Subsequently, however, to their commencement he raised other sums of money on mortgage, and several judgments were entered against him. The mechanics engaged in constructing the enlargement filed their claims against the entire lot and buildings. The questions then are, whether their claims are valid liens, and if they are, to what period of time do they relate, the commencement of the first building, or the commencement of what I shall term, for convenience sake, the enlargement?

"As far as material to the determination of these questions, the auditor reports as facts, and no issue having been demanded as to these facts, we assume them to be correct, that when the first building was commenced it was no part of the plan of the proprietor to make this enlargement; there may have been in his mind a vague hope or expectation that at some future period, when his increase of capital would enable him to do so, he would extend his establishment, and introduce steam as the power by which to carry it on, but there was nothing beyond this, except that the plan may have been originally framed so that such an alteration might afterwards be conveniently made. It is also reported as a fact by the auditor that the change in question was a very material one—the character of the design was different, and that when the whole was done it formed 'an establishment in the same sense and effect as a mill, the machinery of which is driven by one engine placed in a separate house, and so that they would all pass by a deed under the description of a saw factory.'

"We are clearly of opinion that the claims of mechanics employed upon the enlargement, ought not to be held to relate to the commencement of the original building. If they can, then the mechanics and material men who trusted to the credit of the first structure, and based that credit, as they well might do, upon the fact that it was a reasonable and moderate enterprise, suited to the capital and resources of the owner, would be obliged by a subsequent change of plan and a wild scheme of expansion, to lose a large part of their claims, and come in only *pro rata* with subsequent liens to an indefinite amount. There would be thus no limit to the power of the owner to involve them by subsequent changes of his plans. The true point of view to regard this question, by which to test the soundness of the principle to be applied to it, is to consider it as though it were a contest between mechanics and material men who had done their work, and furnished their materials on the credit of the first building, and those en-

[Norris's Appeal—Terry's Appeal.]

gaged on the subsequent enlargement, asking to be paid *pro rata* with them. The very foundation of the lien given to the mechanic or material man is, that he trusts the building. What building? That building which is then in the course of erection upon a certain plan, and with a certain design. It is to be a dwelling-house or a mill, a barn or a church. But if a man, having begun and nearly completed a dwelling-house, should then change his design, and determine to carry up the walls, and make a shot-tower of it, can it be said, in the eye of the mechanics' lien law, that the shot-tower thus finished is the same building as that begun, and that the first and last mechanics are all to come in alike? A principle leading to results which might prove so disastrous to the very class of men protected by this act, ought not to be easily admitted. Nor would it be less dangerous to others. The mortgagee in this case, when he advanced his money on the first mortgage, examined the ground. He saw a building nearly finished, which, when finished, would be a complete structure. He took the precaution to inquire, and satisfy himself that all the mechanics and material men who up to that time had been employed in that erection, were fully paid. Even if the proprietor had then in his mind the idea of an enlargement, is the mortgagee to lose his security entirely by the commencement of extensive additions, the expense of which will swallow up the whole value of the original structure? In the case before us, the cost of the engine and gearing alone, included in the change, was more than $11,000, to say nothing of the engine-house and grinding shop. The true question then, is, was the whole establishment erected on substantially one plan and design from the commencement, or was the plan or design so materially changed during the progress of the work as to make the whole a different building from that which was or would have been erected had no such change taken place? I use this language cautiously, to exclude the idea that any project of subsequent alteration, whether vague or certain, whether entertained at the commencement, or suggested during the progress of the building, and not embodied in the actual plan upon which it was commenced and carried on, could make any difference. If the change, whenever conceived or put in operation, involved the whole design and character of the structure; if the whole, when finished, was substantially a different building from the one which was at first commenced, then the existence of such a design ought not injuriously to affect the liens of the mechanics and others who trusted to the building according to the original plan.

"But it follows not, from this course of reasoning, that the mechanics and material men employed about the enlargement have no lien whatever upon the building when erected, nor that their liens may not legitimately extend to the whole, from the time of the commencement of the enlargement, subject to the

liens which had then already attached to the original structure. We have the fact that the change was a material one, altering the whole design, and that when complete, all together, both the original and the enlarged parts constituted one establishment. The enlargement would be worthless, comparatively at least, if it were separated from the main building, as much so as a kitchen separated from a dwelling. Would this case be different, for better or worse, at least so far as the principle is concerned, if this enlargement had been commenced ten years after the first building was finished, instead of a week before? It is well settled that when the whole design and character of an old building are changed by alteration and improvements, it is to be considered a new erection, within the Acts of Assembly, relating to mechanics' liens. The claims of the mechanics and material men relate to the commencement of the alterations, and are subject to all prior liens, which had fastened upon the land before that period.

" It is, perhaps, not easy to extract any clear rule of determination from the decided cases, as to what alteration of an old building shall constitute a new erection within the provisions of the statutes. It cannot be considered as definitely settled as yet, whether the question is one of law or fact. We have heretofore decided, and as yet adhere to that decision, that when the facts are ascertained or undisputed, it is for the court to determine what does or does not constitute new buildings. If it be a question of fact for a jury, then there may be different verdicts in regard to the same building by different juries, and some mechanics have their claims allowed and others rejected, which would be the most palpable injustice. It is no more an indefinite question than are the questions of reasonable notice and probable cause which have been finally resolved into questions of law for the sake of that certainty and uniformity which are always to be sought after in the administration of justice.

" In Hoover *v.* Pennock, 5 *Rawle* 307, Judge KENNEDY said: ' Neither is it easy to conceive how a change made in the plan of the house after it has been commenced, by enlarging or contracting, or in any other respect changing the plan of it, *as long as the original design of its character is retained*, can with propriety be said to change or give a new commencement to the building of it.' He evidently contemplates that there may be such an entire change of plan as will give a new commencement to the work, and that is when the *original design of its character* is changed. It may be safely conceded that unimportant alterations in the plan, such as the height or the number of the stories, the arrangement and finish of the different rooms, or even the addition of one or more out-houses, not materially altering its character, would not affect the rights of subsequent claimants. But it cannot be meant that there must be a total change of purpose, as from a

store to a dwelling. The cases of Driesbach *v.* Keller, and Armstrong *v.* Ware, show that it is not essential: In Driesbach *v.* Keller, 2 *Barr* 79, there was an old one-story dwelling, the roof was taken off, it was raised one story; a new two-story house was built alongside of it, and the whole put under a new roof. 'Repairs,' said Judge SERGEANT, 'may be slight, or in some cases they may be very considerable, and carried to such an extent as in fact to amount to the erection of a new building, different in its capacities and character from the old one. In extreme cases there can be no difficulty in determining in which class to rank it, either as merely repairing or restoring an old building to its original state, or as in effect, constituting another building. Even a slight addition, manifestly subservient to the original edifice, might, perhaps, be merely a repair. But a substantial addition of material parts, a rebuilding upon another and larger scale, constitutes a new building, even though some portions of the old are perceived and incorporated in the new.' Here was a dwelling-house, which, after the alteration, still continued to be a dwelling-house: Armstrong *v.* Ware, 8 *Harris* 519, was the case of a church which was enlarged, but still continued to be a church. The intermediate case of Landis's Appeal, 10 *Barr* 379, it may be difficult to distinguish upon the facts from Driesbach *v.* Keller, yet the court do attempt to distinguish it, and do not profess to overrule that case. It is clear that it is the extent and character of the alteration, and not the mere change of the purpose of the building, which ought to make the difference. There are, doubtless, cases in which it would be hard to say on which side of the dividing line they are to be placed. The mere change of a common dwelling into a store would not be as material an alteration as that of an ordinary single house into a large costly dwelling, with a double front and extensive back buildings. A man builds a small weaver's shop to weave by hand-looms. He enlarges it to ten times its original size, and introduces power-looms. He may perhaps do so without disturbing a single brick or rafter of the old structure. It was a *factory* at first, it is still nothing but a *factory*, yet *the design of its character*, to use Judge KENNEDY's phrase, has been as materially, nay, more materially changed than if it had been converted into a store or dwelling. The cost of the alteration in its proportion to the whole, might be small in the latter case, in the former it might be so great as to render the cost of the original structure itself but a small proportion to the whole.

"We are satisfied that this principle in its application will do justice in this case. It would give priority to and serve the claims of the mechanics for work done on the first building, if there had been any such remaining unsatisfied. It gives priority to and secures the mortgage executed and put on record before the alteration was begun on the ground. As to the subsequent

mortgages and incumbrances, they have no equity against the intervening lien claimants, the jury upon one of the issues submitted to them, having found that the improvements were commenced on the ground before October 1st, 1853. When these securities attached there was an enlargement of a very considerable nature actually in progress on the premises. They were bound to take notice of it and of its character. The same notice they would be obliged to submit to in the case of such an alteration of an old building as would constitute a new erection. The liens for claims for work done and materials furnished relate to the commencement of the alterations, not by the formation of the plan in the mind of the owner, not by the making of the contracts for the work, but by the work itself on the ground, open, manifest, and, therefore, notice to all the world.

"We think the auditor was right in rejecting the claim of Hooven and Rankom. In a contest between mechanics and others for a fund in court, a judgment recovered by the mechanic upon a *sci. fa.* is as to the other claimants, *res inter alios acta*, and not even *primâ facie* evidence. As a judgment it ranks merely from its date. To come in as a lien, it must be proved so as to entitle it to relate to the commencement of the building. If such judgments were even *primâ facie* evidence, honest mechanics might be defrauded with the greatest ease by the owners, when they become involved, confessing judgments or allowing them to be entered against them, and it would be utterly impossible for strangers to controvert them. The exceptions of Hooven and Rankom are dismissed; the other exceptions are sustained, and distribution is awarded according to schedule B, annexed to the report, the alternation table of distribution; the amount payable to Charles Norris on his mortgage of August 15th, 1853, according to the principles of this opinion, having the preference, but as the fund is sufficient to pay all the liens allowed, and also the first mortgage and part of the second, it is unnecessary to do more than decree distribution of the fund according to said schedule.

"Exceptions of Hooven and Rankom dismissed. The other exceptions sustained, and distribution of the fund in court decreed according to schedule B, annexed to the auditor's report."

From this decree appeals were taken by Charles Norris, claiming the amount of his second and third mortgages, and by Harvey Terry, claiming the amount of his judgment against Conaway.

*Waln* and *W. S. Price*, for the appellants.—Cited Driesbach *v.* Keller, 2 *Barr* 79; Armstrong *v.* Ware, 8 *Harris* 519, 520; Barclay's Appeal, 1 *Harris* 497; Landis's Appeal, 10 *Barr* 379, 381; Miller *v.* Oliver, 8 *Watts* 514; Pennoch *v.* Hoover, 5 *Rawle* 291; Stevenson *v.* Stonehill, 5 *Wh.* 301; Rehrer *v.* Zeigler, 3 *W.*

& S. 259; Knabb's Appeal, 10 *Barr* 188; Yearsley *v.* Flanigen, 10 *Harris* 489.

*Otterson* and *Guillou*, for the appellees.—Nelson *v.* Campbell, 14 *Leg. Int.* 252; Lauman's Appeal, 8 *Barr* 477.

PER CURIAM.—The reasons given by the learned President of the District Court, for the decree entered in this case, are so entirely satisfactory to our minds, that we do not feel called upon to add anything to them. He has indeed expressed some reasons for doubting the views of this court, presented in the case of Armstrong *v.* Ware, 20 *State R.* 520, relative to the mode of deciding when an alteration of a building shall be treated as a new erection, and has not convinced us that we were in error; but this is not material in the decision of this cause.

Decree affirmed at the costs of the appellants.